# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| OCTAPHARMA USA, INC.<br>117 W. Century Road<br>Paramus, New Jersey 07652,<br><br>and<br><br>OCTAPHARMA PHARMAZEUTIKA<br>PRODUKTIONSGES m.b.H,<br>Oberlaaer Straße 235<br>1100 Vienna, Austria,<br><br>*Plaintiffs*,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as<br>SECRETARY OF HEALTH AND HUMAN<br>SERVICES,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>and<br><br>ROBERT CALIFF, M.D.,<br>in his official capacity as<br>COMMISSIONER OF FOOD AND DRUGS,<br>FOOD AND DRUG ADMINISTRATION,<br>10903 New Hampshire Avenue,<br>Silver Spring, MD 20993,<br><br>*Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____ |

## COMPLAINT

Plaintiffs (collectively referred to herein as Octapharma) jointly bring this Complaint against Defendants Xavier Becerra, in his official capacity as Secretary of the Department of Health and Human Services (HHS), and Robert Califf, M.D., in his official capacity as

Commissioner of Food and Drugs, head of the Food and Drug Administration (FDA), and alleges as follows:

1.     This is an action to set aside FDA's approval of three Biologics License Applications (BLAs) submitted by three blood centers for fibrinogen products that have not been demonstrated to be effective through clinical trials.  FDA's approval of these products runs afoul of its own regulations and differs from the agency's treatment of Octapharma's competing products.

2.     For many years, fundamental components of human blood, such as red blood cells, platelets, and plasma, have been safely extracted and used to treat patients with deficiencies of those blood components.  Based on this long history of effective use, FDA applies a lenient standard in approving blood products that qualify as a "blood component," which the agency defines by regulation to mean a "product containing a part of human blood separated by physical or mechanical means."  21 C.F.R. § 606.3(c).  Sponsors submitting BLAs seeking approval of blood components are exempted from submitting many of the elements required of most biological products, such as data from clinical studies.

3.     Some blood products do not meet the definition of a "blood component."  And for those products—referred to as "blood derivatives"—FDA requires substantially more.  BLAs for blood derivatives must be supported by rigorous clinical studies demonstrating the products' safety, purity, and potency, and the product sponsors must use FDA-approved labeling.  21 C.F.R. §§ 601.2, 601.94.

4.     FDA initially approved Octapharma's blood product Fibryga® (fibrinogen (human)) in June 2017.  Fibryga is a fibrinogen concentrate.  Fibrinogen is one of many proteins in human plasma necessary for coagulation; a deficiency in fibrinogen, if untreated, can lead to

uncontrolled bleeding and death.  Fibryga is approved for the treatment of acute bleeding episodes in adults and children with congenital fibrinogen deficiency, an inherited blood disorder in which blood does not clot normally due to an insufficient amount of fibrinogen.

5.    The agency determined that Fibryga should be regulated as a blood derivative.  That meant that during the approval process, FDA required Octapharma to submit clinical studies supporting its BLA.  These clinical studies were lengthy and costly; they took years to complete and cost millions of dollars.  FDA also limited the approved indication for Fibryga to congenital (inherited) fibrinogen deficiency, so that any effort to obtain approval for any form of acquired fibrinogen deficiency must be supported by new clinical trials, necessitating additional significant investments of both time and money.

6.    On three occasions from December 2021 through April 2022, FDA approved fibrinogen products sponsored by three Blood Centers: Central California Blood Center, Community Blood Center, Inc. in Appleton, Wisconsin, and Gulf Coast Regional Blood Center (collectively, the Blood Centers).  FDA licensed each of the three products under the name "Pathogen Reduced Cryoprecipitated Fibrinogen Complex" products.

7.    True to its name, the manufacturing process used to prepare the Blood Centers' products involves complex chemical manipulations, not merely separating blood components "by physical or mechanical means." 21 C.F.R. § 606.3(c).  As such, the products qualify for placement in the same regulatory category as Octapharma's Fibryga product—as blood derivatives, rather than blood components.

8.    Nonetheless, FDA decided to regulate the Blood Centers' fibrinogen products as blood components.  In applying the wrong regulatory standard, FDA allowed the Blood Centers to skip the critical step of submitting clinical studies demonstrating the safety, purity, and potency

of their biological products.

9.      FDA's conduct violates the Administrative Procedure Act (APA) in multiple ways. First, FDA's actions violate the agency's regulations.  The chemical manipulations required to produce the competing fibrinogen products simply do not qualify as the separation by "physical or mechanical means" that defines blood components.  21 C.F.R. § 606.3(c).

10.     FDA's conduct also is arbitrary and capricious.  Among other things, the agency is treating similar products dissimilarly.  FDA has offered no explanation for selectively treating some fibrinogen products as blood components and others as blood derivatives.  The agency's conduct also deviates from its historic practice of characterizing any products subjected to complex chemical processes for reducing the risk of pathogens as blood derivatives.  And FDA's conduct also defies logic, lacks a reasoned basis, and lacks support in the administrative record.

11.     FDA's disparate treatment of the Blood Centers' products causes direct harm to Octapharma.  Octapharma has spent millions of dollars on clinical studies to satisfy FDA's more stringent requirements for blood derivatives.  And more recently, FDA has required Octapharma to conduct *additional* studies of Fibryga in order to obtain approval for acquired forms of fibrinogen deficiency—which are broadly covered in the approvals for the Blood Centers' fibrinogen products.  The additional studies for just one of these other acquired forms of fibrinogen deficiency are expected to take four years and cost over $100 million.  Approving the Blood Centers' competing products subject to a more lenient standard creates a sharply uneven playing field between competing products.

12.     FDA's conduct also presents potential risk to public health due to the absence of clinical study data demonstrating the safety, purity, and potency of the competing products.

13.     FDA's actions are unlawful, arbitrary and capricious, an abuse of discretion, and

otherwise violate the APA.  Its approvals of the Blood Centers' fibrinogen products should be vacated.

## PARTIES

14.     Plaintiff Octapharma USA, Inc. is a Delaware corporation with its principal place of business at 117 W. Century Road, Paramus, New Jersey 07652.  Plaintiff Octapharma USA, Inc. markets and distributes Fibryga in the United States.

15.     Plaintiff Octapharma Pharmazeutika Produktionsge mbH is an Austrian company with its principal place of business at Oberlaaer Straße 235, 1100 Vienna, Austria.  Plaintiff Octapharma Pharmazeutika Produktionsge mbH develops and manufactures medicines sourced from human plasma and human cell lines, including Fibryga.  Octapharma Pharmazeutika Produktionsge mbH is the BLA holder for Fibryga.

16.     Defendant Xavier Becerra is the Secretary of HHS and is responsible for administering and enforcing the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 321, *et seq.*, and the Public Health Service Act, 42 U.S.C. § 202, *et seq*.  Defendant Becerra maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20201.

17.     Defendant Robert Califf, M.D., is the Commissioner of Food and Drugs and is responsible for supervising the activities of FDA, an administrative agency within HHS.  Defendant Califf maintains an office at 10903 New Hampshire Avenue, Silver Spring, MD 20993.

## JURISDICTION AND VENUE

18.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331 (federal question), in that this is a civil action arising under the laws of the United States; 28 U.S.C. § 1346, in that this case involves claims against the federal government; 5 U.S.C. § 702, in that Plaintiffs are seeking judicial review of an agency action from which they have suffered a legal

wrong, have been adversely affected, and have been aggrieved; 28 U.S.C. § 1361, in that this is an action to compel an officer of the United States to perform their duty; 28 U.S.C. §§ 2201–2202, in that there exists between Plaintiffs and Defendants an actual, justiciable controversy as to which Plaintiffs require a declaration of their rights by this Court as well as injunctive relief to prohibit Defendants from violating laws and regulations; 21 U.S.C. § 355(q) and other sources of law, in that the conduct complained of constitutes final agency action.

19.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (e) because this is a civil action in which Defendants are officers of the United States acting in their official capacities and one of the Defendants maintains an office and conducts business in this judicial district. Moreover, a substantial part of the events giving rise to the claims herein occurred within this judicial district.

## FACTUAL BACKGROUND

### *Regulation of Blood Products*

20.     The Public Health Service Act prohibits the introduction of a biological product into interstate commerce unless a biologics license is in effect for that product. *See* 42 U.S.C. § 262(a)(1)(A).  The statute directs FDA to approve a biologics license if the applicant demonstrates that the biological product is safe, pure, and potent, and that the facility in which the biological product is manufactured, processed, packed, or held meets standards designed to assure that the biological product continues to be safe, pure, and potent. 42 U.S.C. § 262(a)(2)(C)(i)(I) & (II).  The statute further grants broad authority to FDA to establish, by regulation, requirements for the approval, suspension, and revocation of biologics licenses. 42 U.S.C. § 262(a)(2)(A).

21.     The statute defines the term "biological product" to include blood, blood components, and blood derivatives. 42 U.S.C. § 262(i).

22.     Although all biological products must meet the statutory standard, FDA has historically treated blood components and blood derivatives differently during the approval process.

23.     Companies that wish to distribute blood *derivatives* must first seek premarket approval from FDA by submitting a Biologic License Application (BLA) accompanied by clinical studies demonstrating that the product is "safe, pure, and potent."  42 U.S.C. § 262(a)(2)(C)(i); 21 C.F.R. § 601.20.   FDA has defined the term "potent" to include effectiveness.   21 C.F.R. § 600.3(s); *see also* Draft Guidance, Demonstrating Substantial Evidence of Effectiveness for Human Drug and Biological Products (2019) at 3, *available at* https://www.fda.gov/media/133660/download.  FDA has made clear that for biologics, proof of effectiveness must, "with limited exceptions, consist of controlled clinical investigations as defined in the provision for 'adequate and well-controlled studies' for new drugs."   Draft Guidance, Demonstrating Substantial Evidence of Effectiveness for Human Drug and Biological Products at 4 n. 6.

24.     FDA also requires that each blood derivative product be distributed with product-specific FDA-approved labeling that provides adequate directions for use, including "statements of all conditions, purposes, or uses for which such drug is intended," unless FDA informs the applicant otherwise.  21 C.F.R. § 201.5; 21 C.F.R. § 601.94.  A biological product is considered misbranded if it does not contain adequate instructions for use; misbranded products may not be distributed in interstate commerce, on pain of civil and criminal enforcement.  21 U.S.C. § 331(a); 21 U.S.C. § 332; 21 U.S.C. § 333(a).

25.     Manufacturers wishing to distribute blood *components*, in contrast, are exempt from many of the foregoing and other preapproval requirements, including clinical trials, labeling

review, prescription drug user fees, and pediatric assessments required by the Pediatric Research Equity Act (PREA).  *See* FDA Guidance, Chemistry, Manufacturing and Controls and Establishment Description Information for Human Blood and Blood Components Intended for Transfusion or for Further Manufacture and For the Completion of the Form FDA 356h (May 1999), at 6, 12–14, , *available at* https://www.fda.gov/media/124371/download (explaining that clinical data, safety reports, and labeling review are not required for BLA submissions for blood components unless the product is novel); *see also* 21 U.S.C. § 379g(1) (exempting blood components from definition of drug applications subject to drug user fees); FDA Postmarket Requirements and Commitments Database for Required PREA Studies (filtered product search "fibrinogen complex" versus "immune globulin"), *available at* https://www.accessdata.fda.gov/scripts/cder/pmc/index.cfm (containing no listing for blood component such as fibrinogen complex, but listing outstanding PREA study requirements for blood derivatives such as immune globulin).

26.    FDA exempts blood components from clinical trials based on their widespread use over many years, in recognition of their effectiveness based on common historical experience.  *See* FDA, Proposed Rule, *Biological Products; Blood and Blood Derivatives; Implementation of Efficacy Review*, 50 Fed. Reg. 52,602, 52,604–52,605 (Dec. 24, 1985), *available at* https://archives.federalregister.gov/issue_slice/1985/12/24/52583-52707.pdf#page=20.

27.    Blood components intended for transfusion also need not carry product-specific FDA-approved labeling.  Instead, they are distributed along with a document known as the "Blood Circular," which provides instructions to physicians for using blood components.  21 C.F.R. § 606.122; *see also* Blood Circular (Dec. 2021), *available at* https://www.aabb.org/docs/default-source/default-document-library/resources/circular-of-information-watermark.pdf.    The Blood

Circular is prepared jointly by the Association for the Advancement of Blood & Biotherapies, American Red Cross, America's Blood Centers, and the Armed Services Blood Program. *See* Blood Circular at 1.

28.     From time to time, FDA issues guidance under its policy for guidance issuance, *see* 21 C.F.R. § 10.115, recognizing the Blood Circular as an acceptable extension of container labels for blood components. *See, e.g.*, FDA Guidance, *An Acceptable Circular of Information for Use of Human Blood and Blood Components* (FDA Blood Circular Guidance) (March 2022) at 1–2, *available at* https://www.fda.gov/media/86898/download; *see also* Ask FDA and CMS/CLIA, Association for the Advancement of Blood & Biotherapies 2017 Annual Meeting (Oct. 10, 2017) at 7, *available at* https://www.aabb.org/docs/default-source/default-document-library/positions/2017-ask-the-fda-and-clia-transcript.pdf?sfvrsn=b4187d0f_0.

29.     When FDA accepts a version of the Blood Circular through guidance, a manufacturer or blood center may label its blood components by including a copy of the Blood Circular in the packaging of the blood component without seeking prior approval from FDA for that labeling, so long as the manufacturer implements the information relating to that particular blood component in the Blood Circular without any major modifications. *See* FDA Blood Circular Guidance at 2.

***Blood Components Versus Blood Derivatives***

30.     It matters a great deal, then, whether a product is classified as a "blood component" or a "blood derivative."

31.     FDA has defined one of these terms by regulation. "Blood component" means a "product containing a part of human blood separated by physical or mechanical means." 21 C.F.R. § 606.3(c).

32.    FDA has not explicitly defined "blood derivative" in a binding regulation, but the line between a blood component and blood derivative has been clarified through its regulations, guidance, and approval practices—all of which make clear that if a product is separated from whole blood solely by physical or mechanical means, it is a blood component.  If not, it is a blood derivative.

**FDA's Regulation of Octapharma's Fibrinogen Product as a Blood Derivative**

33.    Since June 2017, Octapharma has manufactured Fibryga®, a plasma-derived product, for the U.S. market.  Fibryga is licensed (approved for commercial marketing) by FDA for the treatment of acute bleeding episodes in adults and children with congenital fibrinogen deficiency, an inherited blood disorder in which blood does not clot normally due to an insufficient amount of fibrinogen.  Fibrinogen is one of the proteins necessary for blood clotting.  *See* Fibryga Prescribing Information, *available at* https://www.fda.gov/media/105864/download.

34.    Fibryga is manufactured from plasma using a process called fractionation.  The plasma fractionation process involves separating groups of proteins (fractions) from the full mixture of plasma proteins using a combination of changes in pH, addition of solvent detergents, and temperature changes resulting in the formation of precipitates.[1]  The plasma first is subjected to cold temperatures and centrifugation to form cryoprecipitate.  The resulting cryoprecipitate is purified, filtered, and treated with a solvent/detergent mixture to inactivate viruses.  The virally inactivated product is ultimately subjected to rounds of subsequent molecular and physical techniques to further concentrate fibrinogen, such as ion-exchange chromatography,

---

[1]  *See* FDA Guidance, For the Submission of Chemistry, Manufacturing and Controls and Establishment Description Information for Human Plasma Derived Biological Products, Animal Plasma or Serum-Derived Products (Feb. 1999) (Blood Derivative Guidance) at 2, *available at* https://www.fda.gov/media/124397/download.

centrifugation, nano- and ultrafiltration, and freeze-drying.  *See* Fibryga Prescribing Information, Section 11, *available at* https://www.fda.gov/media/105864/download.

35.     As with most other blood products derived from plasma (including albumin, coagulation factors, fibrin, and immunoglobulins), FDA regulates Fibryga as a blood derivative. *See* FDA, List of Fractionated Plasma Products, *available at* https://www.fda.gov/vaccines-blood-biologics/approved-blood-products/fractionated-plasma-products.

36.     Because FDA classifies Fibryga as a blood derivative, the agency required Octapharma to conduct clinical studies to support its BLA.  To that end, Octapharma conducted three clinical studies assessing the safety and efficacy of Fibryga in treating bleeding episodes in patients with congenital (inherited) fibrinogen deficiency.  *See* Fibryga Summary Basis for Regulatory Action at 6–8, *available at* https://www.fda.gov/media/106074/download.

37.     In addition, Octapharma was subject to post-approval study requirements, including an observational study in "patients ≥12 years of age with congenital afibrinogenemia and hypofibrinogenemia treated with [Fibryga] for at least 10 major bleeding events."  *See* Fibryga Approval Letter (June 7, 2017) at 5, *available at* https://www.fda.gov/media/105873/download.

38.     More recently, FDA found that Octapharma must conduct additional studies in order to obtain new indications for Fibryga.  And FDA refused to treat acquired fibrinogen deficiency as a single new indication, requiring separate clinical trials for each setting in which patients becomes fibrinogen deficient, such as cardiac surgery or surgery to treat pseudomyxoma peritonei cancer.

39.     Taken together, the costs and duration of these studies have been extensive.  The initial and post-approval studies of Fibryga for its first approved indication took about 13 years and cost Octapharma about $15 million to date.  Additional studies for just one of the acquired

indications currently covered by the approval for the Blood Centers' fibrinogen products are projected to take four years and cost over $100 million.

***FDA's Regulation of Other Fibrinogen Products as Blood Components***

40.     Between December 2021 and April 2022, FDA approved three competing fibrinogen products sponsored by the Blood Centers.  *See* FDA Alphabetical List of Licensed Establishments Including Product Approval Dates at 16, 19, 30, *available at* https://www.fda.gov/media/76356/download.

41.     The Blood Centers' BLAs permit them to sell fibrinogen products that have been manufactured using an FDA-approved medical device for reducing pathogens known as the INTERCEPT® Blood System for Cryoprecipitated Fibrinogen Complex.  FDA refers to the fibrinogen products manufactured by that system as Pathogen Reduced Cryoprecipitated Fibrinogen Complex products. *See id.*

42.     FDA licensed the Blood Centers' fibrinogen products for a broad range of indications, including treatment and control of *any* bleeding associated with fibrinogen deficiency, whether congenital (inherited) or acquired.  *See* INTERCEPT Blood System for Cryoprecipitation Package Insert For The Manufacturing of Pathogen Reduced Cryoprecipitated Fibrinogen Complex (INTERCEPT Fibrinogen Package Insert) at 2, *available at* https://www.fda.gov/media/143996/download; *see also* Blood Circular at 38.  And unlike for Octapharma's Fibryga, FDA made no distinctions among the various settings in which patients can acquire fibrinogen deficiency.

43.     The manufacturing process for the Blood Centers' fibrinogen products includes photochemical and ultraviolet pathogen reduction and multiple cycles of freezing, thawing, and centrifugation.

44.   The pathogen reduction process begins by subjecting plasma to a photochemical—known as amotosalen (S-59, a psoralen derivative)—which attaches to the nucleic acids in pathogens.  The photochemical-treated plasma is then radiated with ultraviolet light.  The ultraviolet light activates the formation of a chemical bond between the photochemical and the nucleic acids in pathogens present in the plasma, preventing further replication of the pathogens. The resulting pathogen-reduced plasma is subjected to adsorption (a process by which atoms, ions, or molecules adhere to a surface).  *See* INTERCEPT Blood System for Plasma Instruction for Use (INTERCEPT Plasma Package Insert) at 1–2, *available at* https://wayback.archive-it.org/7993/20190208123656/https://www.fda.gov/downloads/BiologicsBloodVaccines/BloodBloodProducts/ApprovedProducts/PremarketApprovalsPMAs/UCM427365.pdf.

45.   After the pathogen reduction process, the resulting plasma is subjected to rounds of freezing, thawing, and centrifugation at low temperatures in order to concentrate the fibrinogen and produce the final product.  *See* INTERCEPT Fibrinogen Package Insert at 2–4.

46.   Notwithstanding that the complex pathogen-reduction process involves photochemical treatment of the plasma and the formation of chemical bonds, FDA has taken the position that the Blood Centers' products should be regulated as blood *components* rather than blood derivatives.

47.   In March 2022, FDA accepted the most recent version of the Blood Circular, prepared in December 2021.  The Blood Circular describes Pathogen Reduced Cryoprecipitated Fibrinogen Complex products as blood components.  *See* Blood Circular at 36–37; *see also* FDA Blood Circular Guidance at 1–2.

48.   As a result, FDA did not require clinical studies to support the licensure of these plasma-derived fibrinogen products—in sharp contrast to its treatment of Octapharma's plasma-

derived Fibryga.   Indeed, FDA omitted the three Blood Centers' BLAs from its list blood

derivatives that required clinical trials, such as albumin and immune globulin products.  *See* FDA,

Licensed        Biological        Products        with        Supporting        Documents,        *available        at*

https://www.fda.gov/vaccines-blood-biologics/licensed-biological-products-supporting-

documents.

**FDA's Conduct is Unlawful, Arbitrary, and Capricious.**

49.     FDA's conduct is unlawful several times over.

50.     First and foremost, FDA's approval of the Blood Centers' fibrinogen products

violates the agency's own regulations.  FDA based the approvals on its conclusion that the three

challenged BLAs are for blood components.  But under FDA's regulations, a "blood component"

is a product separated from human blood by "physical or mechanical means" only.  21 C.F.R.

§ 606.3(c).

51.     The process of making the Blood Centers' fibrinogen products involves subjecting

blood components to a photochemical agent and light activation process, which cause *chemical*

changes in the blood components.  The *chemical* manipulations required to produce the Blood

Banks' plasma-derived fibrinogen products—including the exposure of the plasma to a

photochemical and ultraviolet light and the formation of chemical bonds—simply do not qualify

as "physical or mechanical means."  FDA's conduct therefore violates the plain language of its

own regulation.

52.     In addition, FDA has historically interpreted the phrase "physical or mechanical

means" to exclude viral inactivation steps using chemicals.  *See, e.g.*, Package Insert for Octaplas,

*available at* https://www.fda.gov/media/123132/download (describing clinical trials required for

plasma that is pathogen-reduced using solvent/detergent chemical treatments).

53.     The Blood Centers' use of the INTERCEPT device to manufacture their fibrinogen products involves chemical manufacturing steps.  The use of the INTERCEPT device involves the use of photochemical agents and radiation to disenable nucleic acids.  This process triggers the formation of a chemical bond with the nucleic acids in any pathogens that might be present, thereby inactivating the pathogens.  These chemical manipulations are of the type that FDA has previously found to trigger regulation as a blood derivative.

54.     For all of these reasons, the Blood Centers' products fall squarely within the category of blood derivatives, not blood components.  FDA's treatment of these products is therefore inconsistent with its own regulation.

55.     FDA's treatment of the Blood Centers' fibrinogen products as blood components rather than blood derivatives is also arbitrary and capricious.  FDA irrationally departed from its policy of treating plasma-derived products produced through complex manipulations as blood derivatives rather than blood components, in violation of the APA.  FDA failed to offer a reasoned explanation supported by the record to justify this significant departure.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

56.     FDA's actions also treat materially similar products dissimilarly.  By classifying the Blood Centers' fibrinogen products as blood components, FDA subjected the BLAs to a much lower regulatory burden.  In contrast, by classifying Octapharma's Fibryga as a blood derivative, the agency held Octapharma's BLA to a more stringent standard of review, requiring premarket approval supported by clinical trials, full drug user fees, and pediatric assessments in compliance with PREA.  FDA has offered no explanation to justify such disparate treatment.  That, too, is unlawful.  *See County of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999).

57.     There is no logical basis for treating these competing products differently.  Both products are manufactured by subjecting human plasma to chemical treatment, pooling, adsorption, freezing, cryoprecipitation, thawing, and centrifugation cycles.

58.     But despite the substantial similarities between the processes used to create both Octapharma's Fibryga and the Blood Centers' products, FDA subjects the two fibrinogen products resulting from these processes to disparate treatment.

59.     For all of these reasons, FDA legally erred in regulating the Blood Centers' products as blood components.

**FDA's Actions Are Causing Concrete And Imminent Harm to Octapharma.**

60.     Octapharma has and will continue to be harmed unless FDA properly regulates other fibrinogen products as blood derivatives.

61.     The Blood Centers' products are approved for indications that overlap with that of Fibryga.  The Blood Centers' products are broadly approved for "treatment and control of bleeding, including massive hemorrhage associated with fibrinogen deficiency."  Blood Circular at 38; INTERCEPT Fibrinogen Package Insert at 2.  This includes congenital fibrinogen deficiency, Fibryga's current indication.  *See* Fibryga Prescribing Information.  The products are therefore directly competing in the marketplace for treating the same type of fibrinogen deficiency.

62.     FDA has subjected Octapharma's Fibryga to more stringent preapproval requirements—including clinical studies, labeling review, and drug user fees—that do not apply to fibrinogen products manufactured by the Blood Centers.

63.     The clinical study requirement significantly increases the cost and timeline for seeking a BLA.  The clinical studies required of Fibryga have taken over 13 years and

more than $15 million to complete, and additional studies are expected to cost $100 million more.

64.     In addition to the costs of the studies themselves, FDA levies hefty drug user fees on BLA applicants.  *See* FDA, Prescription Drug User Fee Amendments, *available at* https://www.fda.gov/industry/fda-user-fee-programs/prescription-drug-user-fee-amendments#:~:text=The%20Prescription%20Drug%20User%20Fee%20Act%20(PDUFA)%20was%20created%20by,expediting%20the%20drug%20approval%20process.  Manufacturers of blood components are statutorily exempt from such fees.  *See* 21 U.S.C. § 379g.  As a result, Octapharma had to pay the full fee of over $2 million, while the Blood Centers paid nothing.

65.     This disparate treatment has provided an unfair advantage to the Blood Centers' products in the form of significant financial and time savings, putting them at a competitive advantage over Octapharma's product.

66.     FDA's actions also harm the public.  More lenient regulatory requirements for Pathogen Reduced Cryoprecipitated Fibrinogen Complex products may place the public at risk if the safety and efficacy of the products are not established in clinical studies.  The Blood Centers' products are being advertised for use in various emergency situations, including obstetrics hemorrhage, without accompanying studies confirming that they are safe and effective treatments.

67.     By contrast, FDA is forcing Octapharma to perform clinical trials to establish that Fibryga is a safe and effective treatment for acquired fibrinogen deficiency in these same emergency scenarios.

68.     Octapharma is burdened and will continue to be burdened by the current competitive disadvantage created by FDA's unexplained and disparate treatment of the Blood Centers' products, which has allowed them to sail through the approval process without undergoing the same rigorous review as Octapharma's Fibryga.

## COUNT I
## (Administrative Procedure Act)

69.     Plaintiffs reallege, reassert, and incorporate by reference herein each of the previous allegations as though set forth fully herein.

70.     The APA prohibits FDA from implementing its statutory mandate in a manner that is unlawful, arbitrary, capricious, an abuse of discretion, or contrary to law.  5 U.S.C. § 706(2)(A).

71.     FDA's treatment of the Blood Centers' products as blood components is unlawful and violates the agency's own regulations, policies, and procedures.

72.     The complex chemical manipulations to which the Blood Centers' products are subject do not qualify as "physical or mechanical means" within the regulatory definition of blood components.  21 C.F.R. § 606.3(c).

73.     FDA's treatment of the Blood Centers' products as blood components also is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

74.     FDA's conduct conflicts with the agency's own stated policies and longstanding precedent, without adequate explanation.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

75.     FDA's conduct reflects a failure of reasoned decisionmaking.

76.     FDA has treated similarly situated entities differently without adequate explanation.

77.     FDA's decision to approve the three Blood Centers' BLAs constitutes final agency action for which Octapharma has no other adequate remedy within the meaning of 5 U.S.C. § 704.

78.     There is no mechanism by which Plaintiffs can be made whole for the injuries described herein.  Plaintiffs are without an adequate remedy at law because of the unique nature of the harm they would suffer absent injunctive relief.

79.     The intent of Congress will be served by an Order vacating FDA's approval of the Blood Centers' BLAs and enjoining approval of additional fibrinogen products without the requirement of clinical studies.  In addition, the public interest will be served by such an Order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

A.     A declaration pursuant to 28 U.S.C. § 2201 that FDA's actions are unlawful, arbitrary, capricious, an abuse of discretion, and contrary to law;

B.     Preliminary and/or permanent injunctive relief vacating FDA's approval of any BLAs for plasma-derived fibrinogen products without the submission of clinical studies;

C.     Temporary, preliminary, and/or permanent injunctive relief ordering FDA to refrain from approving any BLAs for fibrinogen products based on the assumption that the INTERCEPT system qualifies as a "physical or mechanical means," 21 C.F.R. § 606.3(c);

D.     An order awarding Plaintiffs' costs, expenses and attorneys' fees pursuant to 28 U.S.C. § 2412; and

E.     Such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Catherine E. Stetson*
Catherine E. Stetson (D.C. Bar No. 453221)
Susan M. Cook (D.C. Bar No. 462978)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington DC 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

cate.stetson@hoganlovells.com
susan.cook@hoganlovells.com

*Attorneys for Plaintiffs*

Dated:  September 14, 2022